UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BARBARA C. LEWIS,

     Plaintiff,

v.                                                                      Case No. 3:14cv25/CJK

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

_____/

## MEMORANDUM ORDER

     This case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") reviewing the ALJ's denial of Barbara C. Lewis' application for Supplemental Security Income ("SSI" ) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in this case, including entry of final judgment.  After review of the record, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence.  The decision of the Commissioner, therefore, will be reversed and the application for benefits will be granted.

## ISSUE ON REVIEW

     Ms. Lewis, who will be referred to as claimant, plaintiff, or by name, raises one issue in this case.  Plaintiff contends the Administrative Law Judge's ("ALJ") decision denying the application for SSI is not supported by substantial evidence

because the record reflects she has deficits in adaptive functioning sufficient to meet Listing 12.05C.  (Doc. 17).

## PROCEDURAL HISTORY

On September 5, 2006, claimant filed an application for SSI, alleging disability beginning August 1, 2006.  T. 131-32, 156.[1]  The application was denied initially on March 5, 2007, and upon reconsideration on June 20, 2007.  T. 70, 77.  Claimant appeared before an Administrative Law Judge ("ALJ") for a hearing on October 9, 2008.  T. 17, 87.  On February 2, 2009, the ALJ issued a decision denying claimant's application for SSI.  T. 4-16.  The Appeals Council denied claimant's request for further review on April 30, 2009, and, as a result, the ALJ's decision became the final determination of the Commissioner.  T. 1-3.  Plaintiff filed a civil action and on June 3, 2010, the U.S. District Court for the Southern District of Texas remanded the case to the Social Security Administration for further proceedings.  T. 522-23.  In accordance with the court's order, the Appeals Council vacated the Commissioner's final decision and remanded the case to an ALJ to "further develop the record regarding the claimant's adaptive functioning for the period prior to attaining age 22" and "re-address whether the claimant's impairments meet the requirements of Listing 12.05C."  T. 526-27.

On March 14, 2009, while her initial claim was pending before the Appeals Council, claimant filed an additional claim for SSI.  T. 526.  The state agency denied the claim initially on July 20, 2009.  T. 526.  Plaintiff requested reconsideration and

---

[1] The administrative record, as filed by the Commissioner, consists of twenty-one volumes (docs. 15-2 through 15-22) and has 1173 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

on November 3, 2009, the state determined plaintiff was disabled as of March 14, 2009, due to major depressive disorder and personality disorder.  T. 526.  The Appeals Council reviewed the evidence supporting the second claim and concluded "to neither affirm nor disturb the reconsideration determination dated November 3, 2009."  T. 526.

On October 12, 2011, claimant appeared for the remand hearing with the ALJ. T. 444.  In a decision dated October 21, 2011, the ALJ denied claimant's application for benefits, finding she did not meet the criteria of Listing 12.05C.  T. 418-37.  In light of plaintiff's successful application for benefits, the ALJ noted "the relevant period of adjudication addressed in this decision is from September 5, 2006," the protective filing date, "through March 13, 2009, the day before the State agency determined that the claimant was disabled."  T. 422.  The Appeals Council denied claimant's request for further review on November 19, 2013, and, as a result, the ALJ's decision again became the final determination of the Commissioner.  T. 414-16.  The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of the final determination by the Commissioner denying claimant's application for SSI.

<u>FINDINGS OF THE ALJ</u>

In the October 21, 2011, decision, the ALJ made a number of findings relative to the issues raised in this appeal:

- Claimant did not engage in substantial gainful activity from September 5, 2006, through March 13, 2009.  T. 424.

- From September 5, 2006, through March 13, 2009, the claimant had the following severe impairments: borderline intellectual functioning (BIF), obesity, chronic low back strain and depression.  T. 424.

- From September 5, 2006, through March 13, 2009, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. T. 424.

- From September 5, 2006, through March 13, 2009, the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), in function by function terms, (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. T. 432.

- From September 5, 2006, through March 13, 2009, the claimant was capable of performing past relevant work as a housekeeper and cafeteria attendant. T. 434.

- The claimant was not under a disability, as defined in the Social Security Act, from September 5, 2006, through March 13, 2009. T. 436.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).

With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla[.]'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). When reviewing a Social Security disability case, the court "'may not decide the facts anew, re-weigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d. 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10-cv-725-FtM-29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.    If  the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not

disabled.

## FACT BACKGROUND AND MEDICAL HISTORY[3]

At the request of the Social Security Administration, Dr. Lynn Fisher-Kittay evaluated claimant's mental functioning on December 12, 2006.  T. 235-41.  Ms. Lewis rode the bus to the appointment and arrived five minutes early.  T. 235.  She reported her daily routine consisted of getting up at 3 or 4 a.m. and trying to clean and wash clothes.  T. 236.  She had no friends and "stay[ed] to [her]self."  T. 236.  She schedules her appointments, relies on public transportation and "usually arrives on time."  T. 236.  Dr. Fisher-Kittay noted claimant presented as "extremely anxious and depressed" but was "neatly groomed and dressed, and her hygiene was intact."  T. 236.  Plaintiff could not spell the word "world."  T. 236.  "[H]er conversation was neither scattered nor unrelated, and there was no evidence of disorganized thought."  T. 236.  She could "solve extremely simple math calculations, but could not interpret a simple proverb."  T. 236.  "Her thought process was concrete" and she "was oriented to person, place, and time."  T. 236-37.  She remembered Dr. Fisher-Kittay's name and the purpose of her visit.  T. 237.  The doctor noted Ms. Lewis' "intellect appeared to fall within the borderline range of functioning."  T. 237.  Claimant could name the then current U.S. president and remember "7 numbers in forward succession, and 3 in backward succession" but "did not remember any of 3 objects after 5 minutes."  T. 237.  She failed to "understand the concept of serial 7's, but she

---

[3] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record.  The facts below, where not derived from the medical records, are based largely on plaintiff's testimony in that regard. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

Case No. 3:14cv25/CJK

attended to [the doctor's] other questions and responded appropriately."  T. 237.

Dr. Fisher-Kittay administered two tests to the plaintiff.  On the Wechsler Adult Intelligence Scale III (WAIS-III), she achieved a Verbal I.Q. score of 66, a Performance I.Q. score of 69, and a Full Scale I.Q. score of 64.[4]  T. 238.  All three scores fell "within the extremely low range of functioning."  T. 238-39.  The doctor noted the results on the verbal portion of the test "suggest that she experiences difficulty with tasks that require word knowledge, abstract verbal reasoning, working memory, and fund of knowledge.  She has little understanding of social mores."  T. 238.  As for the Performance I.Q., the results "suggest that she experiences difficulty with tasks that require attention to detail, visual-motor speed and coordination, spatial problem-solving, non-verbal reasoning, and planning.  T. 239.  The second test administered by Dr. Fisher-Kittay, the Wide Range Achievement Test - Revision 3 (WRAT-3), is an "overall test of achievement and academic functioning[.]"  T. 239.  The WRAT-3 revealed claimant had the reading level of a kindergartner, spelling level of a first grader, and arithmetic level of a second grader.  T. 239.  Dr. Fisher-Kittay noted the achievement scores were consistent with her full scale I.Q and the results of both the WAIS-III and WRAT-3 were "considered a valid assessment of her present level of intellectual functioning."  T. 238-39.  The doctor made a provisional diagnosis of mild mental retardation and concluded claimant could not manage benefit payments in her own interests.  T. 239, 241.

On January 28, 2011, Dr. John Duffy performed a Mental Status and Intellectual Evaluation at the request of the SSA.  T. 776-81.  Dr. Duffy made the

---

[4] *See Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002) (noting the Wechsler Adult Intelligence Scale is "the standard instrument in the United States for assessing intellectual functioning").

following general observations:

> Ms. Lewis is a red-haired female with very nice grooming and hygiene. She had a delightful demeanor and laughed jovially and was playful but not inappropriate.  She was able to listen to questions and respond adequately, although it is clear she is very significantly low in cognitive abilities. . . . I have the impression she wanted to exaggerate her cognitive limitations and minimize psychological issues.  There is some inconsistency from the records where she minimizes any history of significant depression and denies any history of psychosis.  She was driven here by her daughter, as she gave up her driver's license years ago.  She told me she is 4'5" and 172 pounds.  She meant she was 5'4" and was tickled and laughed when I showed her how tall she would be if she were 4'5" tall.  She told me she receives a Social Security check but is not sure why.

T. 776.  The mental status portion of the examination produced similar results to that of Dr. Fisher-Kittay:

> Immediate attention was fair with six digits forwards and three digits backwards repeated.  She was able to correctly do some two-digit calculations involving division.  Verbal abstractions reflected concrete thinking.  Two different judgment questions reflected limited problem solving and reasoning.  She interpreted one simple proverb well but was concrete on another.  She repeated 4/4 words immediately but recalled only 1/4 after a five minute delay, reflecting limited short-term auditory memory.  She named the current President and the preceding President but guessed that Kennedy or Reagan was the President prior to that.  This reflects limited fund of information.  She did correctly tell me the colors of the flag.

T. 777.  Dr. Duffy noted claimant's "IQ is in the Mentally Deficient range."  T. 778. Dr. Duffy initially believed that Ms. Lewis "did not put forth good consistent effort on the testing."  T. 778.  He "felt certain she had not tried her best."  T. 778.  Dr. Duffy readministered eight of the subtests and claimant's full scale I.Q. improved

from 50 to 57.  T.  778.  Although her scores improved upon retesting, Dr. Duffy noted "her scores remain in the Mild Mental Retardation range."  T. 778.  The second set of scores were "within one standard error of measurement of the scores she obtained on the earlier version of this test, taking into consideration the normative changes and the Flynn Effect."[5]  T.  778.  Dr. Duffy concluded "that her true intellectual level is in the Mild Mental Retardation range."  T. 778.  Duffy also noted "[h]er work history in housekeeping would be consistent with her intellectual level."  T. 778.

As part of his report, Dr. Duffy completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  T. 779-81.  He stated claimant would have no limitations on her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions.  T.  779.  He found she would have marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  T.  779.  He further found that claimant would have mild limitations in her ability to respond appropriately to usual work situations and to changes in routine work setting.  T.  780.  Dr. Duffy believed Ms. Lewis could manage benefits in her own interest.  T.  781.

At the hearing before the ALJ, Ms.  Lewis offered testimony as to her education, work history, and daily activities.  She has a limited education. T. 449-72. She stopped going to school after completing the sixth grade because she "never

---

[5] "The 'Flynn Effect' refers to the observed rise in IQ scores over time, resulting in norms obsolescence."  Lisa Trahan, Karla K. Stuebing, Merril K. Hiscock, & Jack M. Fletcher, "The Flynn Effect:  A  Meta-analysis." *Psychological  bulletin*, 140(5),  1332–1360. www.ncbi.nlm.nih.gov/pmc/articles/PMC4152423.  (Last visited 9/24/2015).

could learn anything"; she tried attending night school when she was 16 or 17 to earn a GED but "didn't know enough to continue." T. 455-56. At the time of the hearing, she had lived by herself for about six months. T. 449. She previously lived with her mother and daughter. T. 449. Her daughter lives a block away from her now and visits daily to help her. T. 450-52. She has not driven in "years," but when she did, she felt nervous, so she took the "back streets." T. 453-55. Her daughter now drives her when necessary. T. 460. She has taken the bus before, but has to ask the bus driver about the routes. T. 460-61. Her daughter also grocery shops for her and manages her income. T. 461-62. She cannot read; her daughter reads the mail for her. T. 459-60. Although her three children lived with her when they were growing up, her husband drove them to school and took care of them. T. 462-63. She can prepare simple meals like rice, grilled cheese, and tomato soup. T. 464. Her daughter reminds her to take her medication in the mornings, but Ms. Lewis can remember to take it in the afternoons. T. 467-68. She watches TV three to four hours a day and goes to church once a month. T. 469, 471-72. She can do light housework but most of the time her daughter does the chores. T. 469. She can concentrate for about twenty minutes before she loses focus. T. 470. She receives treatment from Lakeview Center for depression and anxiety. T. 470-71. She has a hard time remembering things. T. 471.

As for work experience, claimant testified that she worked at a Naval base cafeteria distributing food and drinks. T. 456-58. She had to quit because she had trouble counting money and using the register. T. 458-59. She also worked at a hotel as a housekeeper. T. 459.

Dr. Doug McKeown, a psychologist, also appeared at the hearing. T. 472-84. He testified that plaintiff's educational records were "not particularly helpful" as far as evaluating deficits in adaptive functioning because the records do not "really translate into anything that is specifically interpretable." T. 475. While reviewing Dr. Duffy's evaluation, Dr. McKeown noted claimant was considered to have made a "poor effort" and that Dr. Duffy's residual functional capacity did not include any real deficits "other than for complex tasks." T. 475. Dr. McKeown further noted–without elaboration–that a psychiatrist evaluating claimant at Lakeview Center "said IQ was average." T. 475-76. When questioned by the ALJ concerning whether the record reflected deficits in adaptive functioning, Dr. McKeown stated "I don't think there's sufficient documentation there to establish a 12.05 listing, because we can't establish prior to the age of 22, and there's a lot of conflictory information[.]" T. 476. For the time period 2006 to 2011, Dr. McKeown stated Ms. Lewis would have "mild impairments of activities of daily living; moderate impairments of social functioning; [and] moderate impairments of concentration, persistence and pace[.]" T. 478-79. Dr. McKeown concluded claimant would be able to attend for two-hour periods and perform simple, routine tasks. T. 479. Under questioning from plaintiff's counsel, Dr. McKeown stated he would "fully accept that [plaintiff] is functionally illiterate." T. 480. McKeown noted claimant could drive and stated "there's nothing that I can see that establishes that – living skills would be particularly deficient." T. 480. Addressing claimant's I.Q. scores, Dr. McKeown noted "[o]f particular concern would be Dr. Duffy's statements and his report indicating that there was very poor effort" during testing. T. 480-81.

McKeown then noted:

> And then with [Dr. Duffy's] RFC to match up with that is minimal difficulties other than with complex tasks, you just can't establish IQ scores at a significant level of dysfunction.

T. 481.  He also noted claimant's past relevant work was "very limited," "entry-type work" that did not involve "high-level functioning."   T. 481.   Dr. McKeown explained his assessment of claimant's adaptive functioning as follows:

> Well, generally you look at the eight major categories that would associate with the adaptive behavior functioning scales, and that would include the ability to go into public, to make purchases, to eat at a restaurant, to use public transportation, to manage basic skills within a home environment, not necessarily do shopping; drive a vehicle, interact with others.  And the record does support that, you know, her – she does have reasonable skills for interacting and functioning in her environment.

T. 482.  Plaintiff's counsel asked McKeown "what type of level of restriction would you put on her adaptive functioning skills? . . . I mean, how limited is she in adaptive functioning other than just staying [sic] she can or can't do it?"  T. 482.  McKeown responded: "I think she has a moderate limitation, and that would be significantly factoring in her level of cognitive abilities."  T. 482.  Although he noted there were limitations, McKeown stated the limitations would not preclude functioning as far as meeting the challenges of ordinary everyday life.  T. 483.

## ANALYSIS

Ms. Lewis raises one claim of error: the ALJ erred in finding her intellectual disability did not meet the requirements of Listing 12.05C.  (Doc. 17).  Listing 12.05C provides:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.[6]  Thus, "[t]o be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."  *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Although "the SSA has not specifically defined 'deficits in adaptive functioning,' the Diagnostic and Statistical Manual of Mental Disorders ("DSM") states that adaptive functioning 'refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting.'"  *O'Neal v. Comm'r of Soc. Sec.*, No. 14-14011, 2015 WL 3605682 (11th Cir. June 10, 2015) (quoting DSM-IV-TR at 42).

---

[6] The requirement that claimant have "a physical or other mental impairment imposing an additional and significant work-related limitation of function" is not at issue in this appeal.  Also, the Commissioner has not directly challenged the "onset of impairment before age 22" criterion, instead arguing that deficits in adaptive functioning are simply unsupported by the record.

Case No. 3:14cv25/CJK

Here, the ALJ found claimant had "a valid verbal, performance, or full scale IQ of 60 through 70."  In *Lowery v. Sullivan*, 979 F.2d 835 (11th Cir. 1992), the court held:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities.

979 F.2d at 837.  Nevertheless, "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior."  *Id.* (citing *Popp v. Heckler* 779 F.2d 1497, 1499 (11th Cir.1986); *see also Black v. Astrue*, 678 F. Supp. 2d 1250, 1259-60 (N.D. Fla. 2010) ("This appears to be another way of saying that in order to meet the criteria of Listing 12.05C, a claimant must not only have a qualifying valid I.Q. score, but must also satisfy the requirements of the introductory paragraph of that Listing[.]").  Here, the ALJ concluded claimant did not meet Listing 12.05C because "the record does not contain evidence of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested prior to age 22." T. 427.  The ALJ relied on Dr. McKeown's testimony and claimant's daily activities and work history to find claimant did not have the requisite deficits in adaptive functioning.  The undersigned reviews that finding to determine whether it finds support by substantial evidence.

The cases examining a disability claimant's adaptive functioning in the context of a 12.05C listing and I.Q. score are highly fact dependent, and, as a result, the outcomes vary.  *See e.g., Outlaw v. Barnhart*, 197 F. App'x 825, 827 n.1 (11th Cir.

2006) (finding that plaintiff had an I.Q. score above 70, and "[Plaintiff] testified that he had worked for several years as an adult as a van driver, a security guard, and in the shipping and receiving department at a pecan plant. Therefore, [plaintiff's] adult IQ scores were not consistent with his daily activities."); *see also Markle v. Barnhart*, 324 F.3d 182, 186-87 (3d Cir. 2003) ( "ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the I.Q. scores) (citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "reject[ing] the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room."); *Black v. Astrue*, 678 F. Supp.2d at 1261-62 ("Two valid tests scored Plaintiff's lowest I.Q.'s at 59 and 67. Plaintiff worked only as a laborer for Quincy Farms, a job that required only that she pick mushrooms, and lift and carry, and little else. Her ability to drive a motor vehicle short distances, to cook and take care of personal needs, and to handle cash without a bank account, is offset by her reliance upon her family and daughters for more complicated activities and help in raising her children. . . . [I]t was error to fail to conclude that Plaintiff has proved a valid I.Q. score between 60 and 70[.]"); *Alday v. Astrue*, No. 5:08cv217, 2009 WL 347722, at *7 (N.D. Fla. Feb.11, 2009) (reversing for benefits because "there is no evidence here that Plaintiff was malingering or failing to make an effort on the I.Q. test, and the psychologist found the test scores to be valid. There are no equivocal diagnoses here. The psychologist did not find Plaintiff to be in the higher range of borderline

intellectual functioning. Plaintiff's work history has been discontinuous, has not involved skilled work (parts manager, auto mechanic, cosmetology) or supervision of others. . . . Therefore, the evidence of Plaintiff's work history is not substantial evidence in the record to discount her I.Q. scores."); *Davis v. Astrue*, No. 2:07cv880-TFM, 2008 WL 2939523, at *3 (M. D. Ala. July 25, 2008) (upholding ALJ's determination of borderline intellectual functioning of plaintiff with a full scale I.Q. score of 66 because a doctor found plaintiff's adaptive behavior elevated her classification to borderline intellectual functioning, another doctor concurred that the plaintiff had a borderline level of intellectual functioning, plaintiff completed the twelfth grade, plaintiff was capable of reading, writing, and completing simple math problems, had a driver's license, had some training in cosmetology and secretarial skills, and had performed semi-skilled employment). The foregoing cases reflect the fact intensive inquiry the court must make, even upon substantial evidence review.

Turning to the facts of the instant case, and applying the guidance provided by the decisions just discussed, the undersigned cannot discern substantial evidence to support the determination by the ALJ that claimant's level of adaptive functioning is inconsistent with the I.Q. score. Claimant has a sixth-grade education and attended special education classes in fourth, fifth, and sixth grade. T. 535. In sixth grade, aside from one C in physical education, she earned all Ds and Fs. T. 739. When she tried to earn a GED at age 16 or 17, she had to quit because she "just didn't know enough to continue." T. 456. Claimant is functionally illiterate. T. 480. Although Dr. McKeown testified the education records do not "translate into anything that is specifically interpretable," T. 475, claimant's inability to read negatively impacts her ability to meet "common life demands" and live independently, as evidenced by

reliance on her daughter to read the mail.  T. 459-60.  In addition, claimant's education record undermines Dr. McKeown's testimony that "I don't think there's sufficient documentation there to establish a 12.05 listing, because we can't establish prior to the age of 22[.]"  *See Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) (finding claimant's "low-grade dropout" and "participation in . . . special education classes" constitute evidence of manifestation before age 22).

Plaintiff's work history also fails to support the ALJ's decision.  She worked as a housekeeper, cafeteria attendant, and home health caretaker.[7]  T. 485.  None of the jobs plaintiff performed required her to supervise others or employ technical skills.  As a cafeteria attendant, claimant struggled to count money and use the cash register.  T. 458-59, 743.  As a housekeeper, she "did not have to write any reports or complete forms."  T. 155.  Dr. McKeown recognized claimant's past work was "very limited[,]" "entry-type work" that did not "involve[] any high-level of functioning."  T. 481.  Dr. Duffy, who concluded claimant's "true intellectual level is in the Mild Mental Retardation range," specifically noted "[h]er work history in housekeeping would be consistent with her intellectual level."  T. 778.  Thus, although claimant has been able to work in the past, none of the jobs she worked call into question the I.Q. scores or claim of deficits in adaptive functioning.  *Compare Monroe v. Astrue*, 726 F. Supp. 2d 1349 (N.D. Fla. 2010) (history of fast food jobs not inconsistent with I.Q. below 70) *and Durham v. Apfel*, 34 F. Supp. 2d 1373 (N.D. Ga. 1998) ("no evidence [jobs as heavy laborer] are beyond the reach of a mildly

---

[7] The reference to plaintiff's job as a caretaker for a home health care company appears on an intake form for an emergency room visit.  T. 951.  The job was not discussed at the hearing before the ALJ.  As such, it is unclear what tasks claimant performed within the job or what responsibilities she held.

retarded individual") *with Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) ("history of having taught high school algebra" supported finding claimant was not mentally retarded) *and Bischoff v. Astrue*, 2008 WL 4541118 (S.D. Fla. Oct. 9, 2008) (finding no deficits in adaptive functioning where the claimant worked as a parts manager and automobile mechanic, and successfully supervised other people for five years).

The Commissioner also relies upon claimant's ability to take public transportation to Dr. Fisher-Kittay's office as a sign of intelligence. (Doc. 18, p. 6); T. 235. "Going to a bus or metro stop and waiting until the conveyance arrives, however, signals nothing more than a limited ability to follow directions and the ability to learn visual cues of when to get on and off." *Willis v. Astrue*, No. 5:12cv64/RS/CJK, 2012 WL 6725605 *13 (N.D. Fla. Nov. 26, 2012) *report and recommendation adopted by* 2012 WL 6725604 (N.D. Fla. Dec. 27, 2012). Moreover, plaintiff testified she had to rely on the bus driver to ensure she rode the correct bus. T. 460-61. Her mother confirmed claimant was reliant on others while using public transportation. T. 742. Similarly, Ms. Lewis' past ability to drive a car is not inconsistent with her claim of intellectual disability. *See Monroe*, 726 F. Supp. 2d 1349 (noting ability to drive does not preclude meeting Listing 12.05C).

Although claimant lived alone at the time of the hearing, her daughter lived only a block away and visited every day to help with household chores, remind claimant to take medication, and, when needed, take claimant grocery shopping. T. 449, 452, 460, 467, 469-70. Thus, Ms. Lewis' living circumstance does not raise an inference of self-sufficiency so as to cause one to question the I.Q. score.

In sum, the Commissioner argues claimant's past work and ability to "mak[e] purchases, us[e] public transportation, manag[e] skills in the home, driv[e] a vehicle, and get[] along with others" demonstrate she "had reasonable skills in adaptive functioning." (Doc. 18, p. 7-8). The evidence advanced here, however, reflects the very "simple daily activities and simple jobs" this court has deemed insufficient to establish the claimant's "I.Q. score is inconsistent with . . . the claimant's daily activities and behavior." *Monroe*, 726 F. Supp. 2d at 1354-55 (N.D. Fla. 2010). As this court has stated:

> The caselaw addressing the "adaptive functioning" aspect of Listing 12.05C suggests that the adaptive functioning must be significantly inconsistent with the I.Q. score. An ability to do simple daily activities and simple jobs is not enough.

*Id.* at 1355 (finding claimant met Listing 12.05C despite fact she performed household chores, cared for four dogs, could drive a car, and had past work experience as short order cook, fast food worker, and detonator assembler).

The cases the Commissioner cites to support the ALJ's finding that claimant's work experience and daily activities are inconsistent with her I.Q. are distinguishable. Although the claimant in *Hickel v. Comm'r of Soc. Sec.* took special education classes, she graduated from high school and worked part-time as a nursery school attendant. 539 F. App'x 980, 982, 984 (11th Cir. 2013). In addition, based on the *Hickel* claimant's residual functional capacity, three medical sources concluded her "mental impairment was more consistent with borderline intellectual functioning than mild mental retardation." *Id.* at 984-85. Two other doctors who performed I.Q. testing also specifically noted the claimant's adaptive functioning was higher than would be expected given the I.Q. scores. *Id.* at 985. In this case, Ms. Lewis is not a

high school graduate.  The other case cited by the Commissioner, *Garrett v. Astrue*, bears some similarity with the present case but involves a claimant who plays cards, among other activities.  244 F. App'x 937 (11th Cir. 2007) (required limitations in adaptive functioning not present when claimant testified he could return to job as stock assistant with orientation and instruction and record showed he could cook simple meals, perform chores, build model cars, attend church, watch TV, play cards, and walk in the mall).  Although seemingly minor, the ability to play cards significantly differentiates the *Garrett* claimant from Ms. Lewis.  Card playing requires strategic decision-making in light of continually changing circumstances. In addition, the opinion in that case is quite brief.  Because the evaluation of the relationship between I.Q. scores and deficits in adaptive functioning is a fact-intensive inquiry, the undersigned finds *Garrett* provides little guidance as to the result here.

Moreover, here, Dr. McKeown–the testifying expert to whom the ALJ gave "great weight"–stated that "factoring in [claimant's] level of cognitive abilities," he believed she would have "moderate limitation" in adaptive functioning.  T. 482.  He explained "that would denote that there are limitations but it would not preclude" functioning as far as meeting the challenges of ordinary everyday life.  T. 483.  Dr. McKeown also concluded claimant has mild impairments of activities of daily living; moderate impairments of social functioning; moderate impairments of concentration, persistence, and pace; and moderate limitation in adapting to customary, ordinary work pressure.  T. 479, 483.

Plaintiff argues that because Listing 12.05C does not qualify the phrase "deficits in adaptive functioning," any degree of deficit is sufficient to satisfy the

Listing. (Doc. 17, p. 10).  Plaintiff's position finds some support in the caselaw.  As a court within this circuit has noted, the plain language of "Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be 'deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22.'"  *Cammon v. Astrue*, 3:08-cv-131-JFK, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (quoting 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05.").  The argument advanced here, however, has been implicitly rejected by the Eleventh Circuit.  In *Perkins v. Comm'r , Soc. Sec. Admin*, the ALJ found the claimant did not meet Listing 12.05C because he lacked the requisite deficits in adaptive functioning. 553 F. App'x 870, 873-74 (11th Cir. 2014).  When formulating Perkin's RFC, the ALJ found, *inter alia*, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, and pace.  *Id*. at 875.  The Eleventh Circuit affirmed the ALJ's denial of benefits, suggesting there is nothing inconsistent between a determination claimant lacks deficits in adaptive functioning yet still has limitations.  Thus, the correct test appears to require a determination of whether a claimant's deficits in adaptive functioning are so slight as to impeach the I.Q. score.  Here, that cannot be said.  Dr. McKeown specifically stated he believed claimant had moderate limitations in adaptive functioning. T. 482-83.  Furthermore, the behavior and activities the ALJ and Dr. McKeown referenced to undermine the claim of intellectual disability have been found consistent with a person who meets Listing 12.05C.

Plaintiff also argues her mental retardation diagnosis supports a finding of deficits in adaptive functioning. (Doc. 17, p. 10-11).  Although a diagnosis of mental retardation is not required to meet Listing 12.05C,  plaintiff contends her diagnosis

constitutes proof of deficits sufficient to satisfy the listing because a medical professional's diagnosis also requires the deficits.[8]  (Doc. 17, p. 10-11).  In response, the Commissioner notes "impairment(s) cannot meet the criteria of a listing based only on a diagnosis."  (Doc. 18, p. 10) (citing 20 C.F.R. § 416.925(d)).  For Listing 12.05, the SSA has provided the following guidance:

> The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations. The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.

67 Fed. Reg. 20018, 20022 (Apr. 24, 2002).  The SSA's policy statement that Listing 12.05 is "consistent with, if not identical to" the diagnostic definitions used by medical professionals suggests that, in a case involving mental retardation, a *valid* diagnosis of the condition supports the claim that an individual suffers from deficits in adaptive functioning sufficient to satisfy the introductory paragraph of the Listing. An ALJ, however, does not have to credit a doctor's opinion that a claimant suffers from mental retardation.  If the ALJ's reasons for discrediting the doctor's opinion are supported by substantial evidence, there is no error.  *Perkins*, 553 F. App'x at 874

---

[8] According to the Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed. Text Rev. 2000) (DSM–IV), a diagnosis of mental retardation is based in part on:

> Concurrent deficits or impairments in present adaptive functioning (i.e. the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

(finding ALJ's decision to reject doctor's opinion that claimant suffered from mild mental retardation supported by substantial evidence when doctor's opinion was based on contradictory claims by the claimant and inconsistent with other medical opinions).

Here, the ALJ questioned Dr. Duffy's diagnosis of mild mental retardation based on the "poor effort" claimant put forth on initial testing and the lack of limitations contained in the RFC the doctor formulated. T. 434, 776, 779-80. As Dr. Duffy noted, he believed "Mrs. Lewis initially . . . did not put forth good consistent effort." T. 778. After speaking with the claimant, however, Dr. Duffy re-administered "eight of the sub-tests" where he doubted Ms. Lewis' effort. T. 778. While claimant's scores in these sections improved, the improvement was negligible, and Dr. Duffy expressly mentioned in the "TEST RESULTS" section of his report that,

> One can see . . . [the claimant's] . . . scores remain in the Mild Mental Retardation range. They are within one standard error of measurement of the scores she obtained on the earlier version of the test . . . My impression is that her true intellectual level is in the Mild Mental Retardation range.

T. 778. It is clear from Dr. Duffy's report that any skepticism surrounding the initial test was quelled by claimant's second assessment and score which fell "within one standard error of measurement." T. 778. Accordingly, claimant's initial poor effort did not provide the ALJ with good reason to reject Dr. Duffy's diagnosis of mild mental retardation.

The ALJ's reliance on the RFC–as formulated by Dr. Duffy in the Medical Source Statement of Ability to Do Work-Related Activities (Mental)–to discount

Duffy's opinion concerning the diagnosis of mild mental retardation also was inadequate. Although Dr. Duffy assigned no limitations on plaintiff's ability to understand and remember simple instructions, carry out simple instructions, or make judgments on simple work-related decisions, he did find she would have marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. T. 779. The remaining portion of Duffy's RFC found mild limitations in claimant's ability to respond appropriately to usual work situations and to changes in a routine work setting and no limitations in her ability to interact appropriately with the public, supervisors, and co-workers. T. 780. These general conclusions from the RFC, however, do not address some of the more specific areas of adaptive functioning identified by the DSM-IV, including communication, self-care, home living, self-direction, functional academic skills, leisure, health, and safety. Thus, there is nothing inconsistent between Dr. Duffy's diagnosis of mild mental retardation and the RFC he formulated. Dr. Duffy's diagnosis of mild mental retardation, therefore, provides evidence that claimant suffers from deficits in adaptive functioning.

Based on the foregoing considerations, the ALJ's determination that claimant did not exhibit deficits in adaptive functioning sufficient to satisfy Listing 12.05C is not supported by substantial evidence.

The final issue for the court is whether remand or reversal for benefits is the appropriate remedy. Plaintiff has requested that the case be remanded for further proceedings. (Doc. 17, p. 16). Nevertheless, "[r]eversal is warranted where the record is fully developed and, upon the application of the correct legal standards, the claimant is entitled to benefits." *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1381 (N.D.

Ga. 1998) (citing *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991)). Here, the record is fully developed.  There are two I.Q. scores in the record and it is unclear what additional information could be discovered that would better illuminate plaintiff's level of adaptive functioning.  In addition, this case dates back to 2006 and has already been remanded once for development of the record.  The result of another remand would be greater expense for all the parties involved, including the Commissioner, for an outcome that will not change.  The court concludes, therefore, that under the correct legal standards, claimant is entitled to benefits and reversal is the proper remedy here.

CONCLUSION

The ALJ's conclusion that claimant's work history and activities of daily living were inconsistent with deficits in adaptive functioning is not supported by substantial evidence.

Accordingly, it is ORDERED:

1.     The decision of the Commissioner is REVERSED and plaintiff's application for Supplemental Security Income is GRANTED.

2.     The clerk is directed to close the file.

DONE AND ORDERED this 25th day of September, 2015.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 3:14cv25/CJK